36   481
50   302

In the Matter of the Petition of the MINNEAPOLIS & ST. LOUIS RAILWAY COMPANY, for the Appointment of Commissioners, etc.

### April 13, 1887.

Railway—Condemnation Proceedings by Consolidated Company—Inquiry into Constitutionality of Act under which Petitioner claims to be a Corporation.—It appearing that the Minneapolis & St. Louis Railway Company was constituted and organized as a corporation under the original charter granted to the Minnesota Western Railroad Company, and the acts amendatory thereof, and that its corporate franchises

are still being exercised, it is held not to be material in the condemnation proceedings set forth in the record to inquire or determine whether an alleged consolidation agreement, made in pursuance of Sp. Laws 1881, c. 113, between such corporation and certain other lines of railway leased or operated by it, is or is not valid, since, in either case, the petition and proceedings are warranted by the provisions of the charter, and a collateral inquiry into the authority of particular officers or directors to manage its affairs will not be made.

Same—Petition for Railway Crossing—Sufficiency of Evidence·for Petitioner.—The petition in this matter is authorized by Sp. Laws 1879, c. 185, which empowers the Minneapolis & St. Louis Railway Company to construct all or any extensions, branches, and spur tracks, within the city of Minneapolis, which may be necessary to connect its road with other railroads, and, when necessary for such purpose, to enter upon and cross the road-beds and tracks of other railway companies upon paying just compensation, to be ascertained under the condemnation proceedings thereby authorized. *Held*, upon the evidence produced before the district court, that a case was made for its consideration, within the provisions of that act, and authorizing the appointment of commissioners as petitioned for.

Same—Determination of Place and Manner of Crossing—Matters reviewable on Appeal.—Under the provisions of section 4 of the same act, the location and manner of crossing are to be determined upon the evidence produced and showing made before the trial court as questions of fact; and, in reviewing the decision thereon, this court will only inquire whether there are legal errors in the proceedings, or any abuse of discretion on the part of the trial court.

This was a proceeding instituted in the district court for Hennepin county, to condemn for the petitioner a crossing at grade over the right of way and tracks of the respondent, the St. Paul, Minneapolis & Manitoba Railway Company, at First street in the city of Minneapolis. The averment, in the petition, of the petitioner's creation and existence as a corporation is as follows:

"Your petitioner, the Minneapolis & St. Louis Railway Company, avers that on the first day of June, A. D. 1881, it was constituted a corporation for railway purposes, under the corporate name of the Minneapolis & St. Louis Railway Company, and vested with and now owns and possesses all the rights, properties, and franchises of the

Minneapolis & St. Louis Railway Company, (that certain corporation created by and existing under chapter 66 of the Special Laws of the legislature of the territory of Minnesota, entitled 'An act to incorporate the Minnesota Western Railroad Company,' approved March 3, 1853, and the several acts amendatory thereof,) the Minneapolis & Duluth Railway Company, (a corporation duly created and existing under the laws of the state of Minnesota,) the Minnesota & Iowa Southern Railroad Company, and the Fort Dodge & Fort Ridgely Railroad Company, (each a corporation for railway purposes, duly organized and existing under the general incorporation laws of the state of Iowa,) by and through certain consolidation proceedings and agreements entered into between said companies severally, pursuant to the laws aforesaid, the general laws of this state and similar general laws in the state of Iowa."

The petition then alleges the petitioner's ownership and operation of various lines of railway, (including those of the original Minneapolis & St. Louis and the other consolidating companies, except the Minneapolis & Duluth Co.,) and also of a system of tracks in Minneapolis reaching the flouring and other mills in that city, and sets forth at large facts showing that the public interests require its railway to be connected with that of the Northern Pacific Railroad Co. by a crossing of the respondent's tracks upon a strip of ground described in the petition.

The original answer denied any knowledge or information as to the acquisition by petitioner of any of the rights, property, or franchises of any of the companies alleged in the petition to have become consolidated. The answer was afterwards amended by substituting for such denial the following:

"That said petitioner is not a corporation, either as alleged in said petition, or in any other manner or form whatever, and is not the owner of the property or franchises named or of any property or franchises whatever.

"And respondent, further answering, denies that said petitioner has any right or authority to maintain the said petition or any other proceedings to acquire any lands of the respondent, or any lands or any interests or rights therein."

The answer also alleges facts showing that the public interests do not require the crossing asked for or any crossing of respondent's lines, and that any such crossing will be dangerous to persons and property and obstructive to traffic, and prejudicial to the public interests served by the respondent. Upon this branch of the case a large amount of evidence was taken on both sides.

To prove its incorporation and right to maintain the proceedings, the petitioner introduced in evidence the charters and articles of incorporation of the original companies, and also the act of March 2, 1881, (Sp. Laws 1881, c. 113,) under which the consolidation proceedings were had. This was objected to as "in excess of the authority of the legislature," but was received, the respondent excepting. The petitioner also introduced the proceedings of the original companies for effecting a consolidation under the act, and the agreement of consolidation between them.

The special act is similar in its provisions to the general law (Gen. St. 1878, c. 34, §§ 36–38) for consolidation of domestic railroad companies, but differs from it, as well as from the general laws authorizing consolidation of domestic companies with those of other states, (Laws 1881, c. 94,) by authorizing a consolidation where the connection between the lines of the consolidating companies is formed "by means of any intervening railway, bridge, or ferry." It also differs from the general laws in some of the details of the procedure to be observed, but agrees with them in providing for the creation, by means of the consolidation, of a "new corporation," distinct from the "old corporations," and possessing all the powers, franchises, and property of "the former corporations," and liable upon all their obligations. The agreement for consolidation, executed by the four original companies, recites the power conferred on the original Minneapolis & St. Louis Company by the special act, and contains an agreement of transfer, by all the parties to it, "of their respective railways, property, franchises, and management to the new corporation hereinafter named," etc., and provides that the companies executing the agreement shall, from and after June 1, 1881, "become and be forever consolidated, amalgamated, and merged into one new or consolidated company or body corporate, under the name of 'the Minneap-

olis & St. Louis Railway Company,' a corporation of Minnesota and Iowa."

Petitioner also introduced in evidence Sp. Laws 1879, c. 185, authorizing the original Minneapolis & St. Louis Company to build extensions to connect its line with other railroads in Minneapolis, and to build and operate branches and spurs to any mills, manufactories, etc., in that city, and also authorizing it to effect a crossing of other railroads by proceedings to be taken in conformity with its charter as amended by former legislation, and differing in some respects from the requirements of the general law (Laws 1879, c. 80,) in conformity with which general law this proceeding was instituted.

Both parties introduced in evidence before the referee a great volume of evidence upon the question of the necessity of the proposed or any grade crossing, and as to whether it was required by or was prejudicial to the public interests, and upon the other issues made by the pleadings.

Upon the coming-in of the referee's report of the evidence, the cause was heard by *Young, Lochren,* and *Koon,* JJ. At the hearing, "the respondent did contend that the attempted formation of the petitioner as a corporation by the proceedings put in evidence by it, under the special act of the legislature of this state, approved March 2, 1881, also in evidence, was void because forbidden by the constitution of this state.

"And the respondent also insisted that the evidence failed to show that the formation of the petitioner as a consolidated corporation was or is authorized by any law of this state, for the reason that (as the respondent claimed) the evidence shows that the railway of the original Minneapolis & St. Louis Railway Company, one of the parties to such attempted consolidation, and that of the Minneapolis & Duluth Railway Company, another of the parties to said consolidation, as constructed at the time of said attempted consolidation and as ever since existing, could not and cannot be operated together so as to constitute one continuous main line, so as to admit of the passage of trains over them without break or interruption.

"And the respondent thereupon insisted that the petitioner, not being a corporation, could not maintain this proceeding.

"The court overruled the said contentions of the respondent, and ruled that the petitioner was a corporation entitled to maintain this proceeding, to which ruling the respondent duly excepted."

The evidence as to the connection of the two railways last named was that the Minneapolis & Duluth terminated in East Minneapolis, and the Minneapolis & St. Louis in West Minneapolis, their termini being about a mile apart and separated by the Mississippi river. At the time of the consolidation proceedings the only connection between them was by means of the bridge and track of the St. Paul, Minneapolis & Manitoba Ry. Co., of which the Minneapolis & St. Louis Co. had a temporary use.

The court also held that a crossing should be granted, and thereupon further evidence was taken before the court as to the merits of a proposed undergrade crossing, a large part of the cost of which the respondent offered to bear. The court finally made an order granting a grade crossing, and containing the provisions mentioned in the opinion. From this order the respondent appealed. The proceedings on a writ of prohibition to restrain proceedings under the order pending this appeal will be found in *State* v. *Dist. Court of Hennepin County*, 35 Minn. 461.

*R. C. Benton, Chas. E. Flandrau,* and *Geo. B. Young,* for appellant.

*J. D. Springer, E. M. Wilson, J. M. Shaw,* and *John B. Atwater,* for respondent.

VANDERBURGH, J. The Minneapolis & St. Louis Railway Company, a corporation created and existing under the laws of this state, had, in the year 1881, constructed and then owned, and was operating in pursuance of its charter, a line of railway from the city of Minneapolis to the southern boundary of the state, with its terminus on the west side of the Mississippi river, in the city of Minneapolis. It was also at the same time operating, in connection and continuous with its own line, the Minnesota & Iowa Southern Railroad and the Fort Dodge & Fort Ridgely Railroad, Iowa corporations, whose stock was nearly all owned by the Minneapolis & St. Louis Railway Company, and these roads were, to all intents and purposes, used and controlled as a part of its own system, though having separate corporate organi-

zations.   The Minneapolis & Duluth railway, extending from East Minneapolis to White Bear, and connected with the Minneapolis & St. Louis by a bridge, was also operated, in connection with its own line, by the Minneapolis & St. Louis Railway Company, under a lease.

In 1881 the legislature (Sp. Laws 1881, *c.* 113) amended its charter, and authorized it to acquire, "by purchase or lease, any other railroads in or out of the state whose lines connect with its own lines, as they now exist, or shall be extended either directly or by means of intervening lines," and also authorized it to merge and consolidate its stock, franchises, and property with those of any other railroad, in the construction of whose lines the Minneapolis & St. Louis Company shall have aided, or which may be held under lease by it.   The same year the legislature also authorized by general law the consolidation of roads, and the purchase and lease thereof, so as to constitute continuous lines, with or without branches.   Laws 1881, *c.* 94. The Minneapolis & St. Louis Railway Company entered into an agreement of consolidation with the railroads above enumerated, in pursuance of Sp. Laws 1881, *c.* 113, above referred to, and such consolidation is alleged in the petition herein.

The court, upon the evidence submitted, finds, generally, that the petitioner, the Minneapolis & St. Louis Railway Company, is a corporation for railway purposes, created and existing under the laws of this state, and as such is entitled to exercise the power of eminent domain.   This is assigned for error, and the constitutional validity of the special act authorizing the consolidation of the roads, and the consequent right of the petitioner, as representing the new corporation, to institute these condemnation proceedings are denied.   The answer, as originally drawn, did not deny the corporate existence of the petitioner, but merely put in issue its acquisition of the franchises, rights, and properties of the several corporations named, whether by means of the alleged consolidation agreement or otherwise.   And the evidence on this branch of the case was all received under the issues so framed.   Subsequently, on the coming in of the report of the referee appointed to take the testimony, the answer was allowed to be amended, by substituting a denial of the corporate existence of the petitioning corporation.

1. The abstract question of the validity of the consolidation agreement we do not deem it necessary to determine in this case. It involves matters of grave importance to the corporators or stockholders, but which in no way, as we think, affect the discharge of its duties to the public by the St. Louis Company, or the nature or extent of its business, or the necessity or propriety of the crossing petitioned for. It is not questioned that the proposed crossing and connection are on the original line of the St. Louis Company, as operated before the attempted consolidation; and the provisions of its charter are ample to warrant the petition and proceedings instituted herein. If the consolidation agreement is void because the special act in question is unconstitutional, then the St. Louis Company, whose existence and organization under its original charter, and the acts amendatory thereof, cannot be questioned here, has never been merged or ceased to exist, and may be deemed to be the corporation represented in these proceedings. Its franchises continue to be exercised, and this court cannot institute a collateral inquiry as to the rights of stockholders, or whether the present officers and managers have been regularly and legally elected and placed in control of its affairs or not.

The case is fairly before us on the merits. The control or extent of the business of the petitioning company is not affected by the question of the consolidation. This was already fixed by its relation to the other corporations whose roads, under the existing statutes, it operated substantially as owner or lessee. Laws 1881, c. 31. The consolidation related rather to the stock and organization, than to any change in the nature and extent of the corporate business, or the exercise of the corporate franchises.

We apprehend that, if this petition had contained no reference to the alleged consolidation, it would have been no answer that an abortive attempt had been made to consolidate the other corporations named with the St. Louis Company under an unconstitutional statute. The variance is not material.

2. The application is authorized by Sp. Laws 1879, c. 185. Chapter 183 and chapter 184 are substantially similar acts, conferring like powers upon certain other railroad corporations entering the city

of Minneapolis. The act referred to authorizes the Minneapolis & St. Louis Company to locate, construct, maintain, and operate any and all extensions and branches that may be necessary to connect its road with any and all railroads now built, or hereafter to be built, to or into the city of Minneapolis, and to build and operate extensions, branches, and spur tracks, from any of its lines to any mills, manufactories, or other industries requiring railway facilities in said city. And by the same act the same company is authorized, "whenever or wherever it may be or become necessary to the carrying out of the purposes and exercising the powers granted by this act, to enter upon the tracks and road-beds of any other railroad corporation, for the purpose of effecting a crossing upon, over, or under the same," upon paying just compensation to the corporation injured thereby, to be ascertained as therein provided. And "the district court to which the petition shall be presented shall, at the time of the appointment of commissioners, at the request of either party, and upon such showing as the court shall deem necessary and proper, prescribe the location and manner in which such crossing or connection shall be made, so as to effect the purpose of the petitioning corporation, and at the same time do the least injury to the corporation whose property is taken."

It is obvious that these special acts were passed by the legislature in aid of commerce, and in the public interest, in order to facilitate intercommunication and transfers between the railroads, and the handling of freight to and from the mills and manufactories in the city, so as to make the transfer of cars and the transhipment of freight convenient, cheap, and expeditious. And there can be no doubt of the power of the legislature to authorize the exercise of the right of eminent domain to condemn rights of way for such purposes. *Clarke* v. *Blackmar*, 47 N. Y. 150. And we are also clearly of the opinion that a case was made upon the evidence produced before the district court for its consideration, within the provisions of the act in question allowing condemnation proceedings.

The object of the proceedings is to effect a crossing over the appellant's road by the petitioning corporation, so as to connect with the Northern Pacific Railroad, whose yard and tracks lie north of and

adjacent to the tracks of the Manitoba Company; the petitioner also having a right of way and a track extending to the proposed place of crossing. Both railroad companies have extensive lines, and transport large amounts of freight. The petitioner has no direct connection, giving it access to saw-mills in the city situated north of the proposed crossing to which the tracks of the Northern Pacific Company have access, and from which large amounts of manufactured lumber are shipped to distant markets. On the other hand, the Northern Pacific Railroad Company has no direct connection, giving it access on the west side of the river to several large flour-mills, which require a large amount of wheat, and which are reached and served exclusively by the tracks of the petitioner. It is insisted by the petitioner, upon the evidence adduced, that the public interest and convenience demand that the proposed direct connection be made for the mutual interchange of traffic between the companies. The transfers are made at present by the Manitoba Company by switching cars along and across its own line for a fixed compensation or charge per car.

In view of the situation of these lines of road, and the evident purpose of the legislature in passing the act authorizing railway connections and crossings in the city of Minneapolis, we are very clearly of the opinion that this court would not be warranted in reversing the order of the court below directing the appointment of commissioners. The legislature has the power to subject railway companies, under such circumstances, to the burdens imposed by this act. They hold their charters in subordination to the public interest, subject both to the exercise of the power of eminent domain and the police power of the state. And where the facts disclosed are such as to warrant a crossing under the statute, the right to cross is as clear as the right of the original company to acquire the land in the first instance. *Railway* v. *Railway*, 30 Ohio St. 604, 611.

The evidence shows that the Northern Pacific Railroad Company control and have the right to operate under a lease a line of road from Twentieth avenue south, on the west side of the river in Minneapolis, to St. Paul, including a bridge, which road connects on the south with the tracks of the St. Louis Company running north through

the city to the proposed crossing. The Northern Pacific Railroad Company can make no connection on the west side of the river with such line to St. Paul save over the St. Louis tracks, its only other connection being between the two cities of St. Paul and Minneapolis on the east side of the river.

It is argued that a crossing ought not to be condemned at the instance of the St. Louis Company for the benefit of the Northern Pacific Railroad Company. On the part of the petitioner, the evidence tended to show that the purpose of the petitioner, in seeking to condemn the crossing, was to secure a direct connection with the Northern Pacific Company for business interchange between the roads coming out from their respective lines, and for business that originates at industries located on their respective tracks inside the city of Minneapolis. It also appears that the connection over its line through the city by the Northern Pacific Company was contemplated by the petitioner, and was one of the purposes for which the crossing is sought. And a contract granting such use of its tracks to the Northern Pacific Railroad Company, for a consideration to be paid to the petitioner, has been entered into between the parties, and was offered in evidence as part of the petitioner's case. It was properly received and considered upon the question of the extent and nature of the business, for the transaction of which the proposed railway connection was demanded. *Matter of Boston, etc., Ry. Co.,* 79 N. Y. 64.

It is to be presumed that such connection will be mutually beneficial to both companies, and that the cars of each will be transferred; and the transportation of the cars of the Northern Pacific Company on the track of the petitioner, whether to the leased line terminating at Twentieth avenue south to the mills, or other railroad lines, would be fairly within the scope and purposes of these condemnation proceedings, as authorized and contemplated by the statute. Whether such transportation must be effected by the St. Louis Company, or whether it may be done by the Northern Pacific Company, by virtue of a lease or contract entered into under Gen. St. 1878, *c.* 34, § 69, or otherwise lawfully authorized, we need not determine. The evidence is, in any event, sufficient to support the determination of the district court.

3. We come next to inquire whether there was any legal error or abuse of discretion on the part of that court in prescribing the location and manner of crossing. This matter is to be determined as a question of fact, upon all the evidence in the case. *California Southern R. Co.* v. *Southern Pac. R. Co.*, 67 Cal. 59, (7 Pac. Rep. 123.) As in such cases the premises are to be used jointly, the statute requires the interests of the parties to be harmonized, so as, on the one hand, to secure, and not defeat, the purposes for which the crossing is sought, and at the same time do the least injury to the corporation whose property is taken. The inquiry upon this branch of the case was exhaustive and thorough on both sides; and, upon the coming in of the referee's report, the judges pursued the investigation still further, and both parties were permitted to introduce evidence at great length before them, to the end that the case might be fairly presented and carefully and justly determined. And we are unable to say, upon a careful examination of the record, that there is not sufficient evidence in the case to justify the order as finally made with the conditions and restrictions annexed.

The order, as we interpret it, permits a permanent crossing by the petitioner over the right of way and tracks of the appellant near the place petitioned for, upon a strip of land 15 feet in width; the location, course, and distances being carefully prescribed by the court on its own judgment, upon the evidence, in order to secure the best practical results. The single-track railway so allowed to be constructed is required by the order to conform to the grade and railway of the appellant, "now or hereafter to be established." This provision was, we presume, inserted in view of the evidence on the part of the appellant tending to show the necessity of reducing the grade three or four feet at that point. We think the order preserves all rights necessary to the enjoyment of the premises by appellant, consistent with the use thereof for a crossing by the petitioner. The form of the order is not justly subject to criticism in this respect. It also secures to the Manitoba Company the preference in respect to the right of way, by providing that its trains should have priority over the trains of the same or inferior class upon the transverse line at the place of junction or intersection. It also requires the preservation

of a permanent connection near the First-street bridge, between the tracks of the Northern Pacific Company and the most northerly track of the appellant, to be maintained by the device known as the "slip-switch," or some other appropriate instrumentality.

The court did not deem it wise or necessary to prescribe further regulations, or require other devices to be employed at the crossing. The details of the management will necessarily be worked out in the natural adjustment of the business relations of the companies in the joint use of the premises, and in the moving of trains in the order required by the court, securing priority to the appellant. The plan adopted, and conditions and restrictions prescribed in the order, are evidently the result of the best judgment of the trial court, after consideration of the evidence of the witnesses, including that of the experts, and after examining the several plans and schemes proposed by the parties. The appellant's plans included an elevated crossing by a bridge, an under-crossing by means of a cut or tunnel, and a crossing at grade; the latter at a different angle, and at a different point, from that proposed by the petitioner. The plan for an elevated crossing was not insisted on in argument. The evidence in the case also disclosed serious objections to an under-ground crossing, and tended to show that it would require a cut for a long distance on either side, which would greatly interfere with the handling and transfer of cars and the use of the yard north of the crossing, and would require to be very deep, particularly after the proposed lowering of the tracks of the appellant. And we notice that the engineers of appellant thought so little of this scheme that it was not considered by them, or included in the plans for a proposed crossing devised by them after much consultation, until after the commencement of the trial; and some of them did not hesitate to say that the scheme for an elevated crossing was the best of the two. It must be assumed that any crossing will be more or less injurious to the appellant; hence the commission to ascertain the damages.

As respects the apprehended danger resulting from a grade crossing, we see no reason why the existing arrangements of the Manitoba Company for the safety of trains at this point may not continue to be successfully maintained. Under these regulations, all east-bound

trains are required to come to a full stop west of the First-street bridge, and all west-bound trains are subject to be stopped in a like manner upon signal; and such trains are the more readily stopped on account of the up grade; and the movements of all trains near this point are governed by signals of warning, where the tracks are preoccupied. These signals are readily and successfully operated by an employe in charge thereof; and we are unable to see why they may not continue to be employed at the same place. And at this point all trains are subject to police regulations as to the rate of speed, and must, it is presumed, necessarily move slowly. Besides, the crossing can only be occupied by the petitioner in subordination to the rights of the Manitoba Company, as prescribed in the order of the court; and it will necessarily be compelled to make regulations in conformity therewith. These signals are now in use to warn approaching trains while transfers are made from the Northern Pacific and Omaha Companies' tracks in the same locality, to the tracks of different roads, including the St. Louis; and no reasons appear why they may not be equally available in the case of transfers over the proposed crossing.

We discover no errors in the record which would warrant this court in reversing the order of the district court.

Order affirmed.